UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 2:16-cr-00004-NT |
| ) | |
| KEVIN MILLETTE ) | |
| ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S
### MOTION FOR COMPASSIONATE RELEASE

Defendant Kevin Millette has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion with prejudice because Millette has not met his burden of establishing that a sentence reduction is warranted under the statute. First, he has not met his burden to show extraordinary circumstances exist in his case to warrant the reduction in sentence. Second, even if his case were exceptional, he fails to meet his burden in showing that a reduction of sentence would be appropriate in light of the continuing danger he poses to the community.

#### FACTUAL BACKGROUND

On January 28, 2016, Millette pleaded guilty to a one-count Information charging him with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). On June 16, 2016, this Court sentenced him to 120 months imprisonment, the mandatory minimum term in light of his prior child pornography conviction. His current projected release date from Danbury FCI is May 25, 2024.

On April 21, 2020, Millette administratively requested consideration for compassionate release. On April 29, 2020, the warden of Danbury FCI denied the

request. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from Bureau of Prisons (BOP) custody, relying on the threat posed by the COVID-19 pandemic.

## I.     BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan–Module 1: Surveillance and Infection Control (Oct. 2012), https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its action plan to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the plan to address the crisis. The current modified operations plan requires that all inmates in every BOP

institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. *See* BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp. All staff and inmates have been and will continue to be issued facemasks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

      Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A medical officer can place on leave any staff member with a stuffy or runny nose.

      Contractor access to BOP facilities is restricted to those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent

authorization by BOP's Deputy Director. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page. *See* BOP: COVID-19 Update, https://www.bop.gov/coronavirus/.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020,

BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that had seen the greatest incidence of coronavirus transmission, including Danbury FCI. As of this filing, BOP has transferred 4,414 inmates to home confinement, which is an increase of 155% since March 2020. *See COVID-19 Home Confinement Information*, BOP: COVID-19 Update, https://www.bop.gov/coronavirus/.[1]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff

---

[1] With respect to home confinement requests at Danbury FCI in particular, the government acknowledges that the process is not a substitute for this Court's consideration of Millette's request for compassionate release. Last month, the court in *Martinez-Brooks v. Easter*, No. 3:20-cv-00569 (MPS), 2020 WL 2405350 (D. Conn. May 12, 2020), concluded that the plaintiffs, inmates at Danbury FCI, had shown a likelihood of success on the merits of their claim that the warden's inadequate implementation of the home confinement authority in the CARES Act constituted "deliberate indifference" under the Eighth Amendment. *Id.* at *23. The court also concluded that "neither the Warden nor the BOP as a whole is implementing Section 3582(c)(1)(A) in the way Congress intended when it adopted the First Step Act, and neither has made any noticeable effort to update the process for evaluating 'compassionate release' requests to take account of the COVID-19 pandemic." *Id.* at *24. The court issued a temporary restraining order, requiring among other things that the warden file with the court a list of medically vulnerable inmates at Danbury FCI, and finalize and implement a process making full and speedy use of the BOP's home confinement authority. *Id.* at **32-33. A preliminary injunction hearing in the case is scheduled for July 22 and 24.

and inmates, while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, including at Danbury FCI, and more likely will in the future. As of the date of this filing, two inmates at the facility have confirmed active cases of COVID-19, but no staff members have active cases. There has been one inmate death at the facility, and 95 inmates and 61 staff members have recovered. *See COVID-19 Cases*, BOP: COVID-19 Update, https://www.bop.gov/coronavirus. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.    Millette's Conviction and Request for a Sentence Reduction

Millette is currently serving a 120–month sentence for one count of child pornography possession. He committed his federal child pornography offense following a state conviction in 2010 for Possession of Sexually Explicit Materials of Minor under 12.

6

Rev. PSR ¶ 33. In the state case he received a sentence of two years imprisonment, with all but 90 days suspended, followed by probation for two years. *Id.*

As of May 27, 2020, Millette's projected release date is May 25, 2024. He has served 45.2% of his full term and 53.1% of his projected statutory term. His credit to date includes the nearly seven-month period he spent in custody between his arrest and his sentencing. *See* Exhibit 1 (Sentence Monitoring Computation Data).

On May 19, 2020, Millette filed a pro se motion for compassionate release. Document 68. The court appointed counsel, and on June 17, 2020, Millette filed an amended motion seeking compassionate release, alleging that his medical issues put him at high risk should he contract COVID-19, and that Danbury FCI did not have adequate safety measures in place to protect him. Document 74.

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, as it has been here, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling

reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.[2]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)–(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).

## ARGUMENT

Millette's motion for a reduction of his sentence should be denied for two reasons. First, he has not established "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, he poses a continuing danger to the community in light of his long history of child pornography activity.

**I. Millette Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction**

Millette's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's

9

policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. U.S.S.G. § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore cannot alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the

statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 efforts, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a worldwide viral pandemic.

Millette identifies several medical conditions that he claims put him at high risk should he contract COVID-19: heart disease, hypertension, high cholesterol, a weakened immune system and mental illness. Def.'s Mot. at 1–4. At first glance, this combination of conditions appears to place Millette within groups that are acknowledged to be at high risk. Upon closer examination, however, it is apparent that the conditions do not constitute extraordinary and compelling reasons for his release.

The government acknowledges that some medical conditions constitute COVID-19 risk factors that in some cases can lead to a finding of exceptional circumstances. Those conditions include serious heart conditions such as heart failure, coronary artery disease, congenital heart disease, cardiomyopathies and pulmonary hypertension. *See* Groups at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions. Millette notes that he suffered three heart attacks before the age of 38, and had a stent implanted to keep his artery open. Without in any way minimizing the seriousness of his prior medical history, however, the government submits that his BOP medical records, relevant portions of which are attached as Exhibit 2, show that he is not currently

11

diagnosed with any of the CDC-recognized heart conditions, and is not suffering any cardiac abnormalities:

- A May 21, 2020 chest x-ray showed "[n]o acute cardiopulmonary disease. Stable radiographic appearance of the chest compared to prior exam of 8/19/16." Exhibit 2 at 1.

- Notes of a May 6, 2020 Chronic Care Clinic encounter showed that Millette had no complaints regarding his hypertension, endocrine/lipid issues or cardiac issues. *Id.* at 2. He was diagnosed with essential (primary) hypertension; heart disease, unspecified; and hyperlipidemia, unspecified. *Id.* at 3.[3]

- Notes of a June 24, 2019 Chronic Care Clinic encounter showed that Millette reported he had a history of three heart attacks and had a stent in place for nine years. He was compliant with medication use and voiced no concerns. *Id.* at 4.

- Notes from a dental visit on December 31, 2018, showed that he denied any cardiac complications. He reported that he had a blood clot and had a stent implanted eight years prior, but denied any complications since then. *Id.* at 5.

- An August 19, 2016 chest x-ray showed "[n]o radiographic evidence for an acute cardiopulmonary process." *Id.* at 7.

These records demonstrate that while Millette has previously suffered from cardiac issues, he is not currently diagnosed with any serious heart conditions identified by the CDC as risk factors for COVID-19, and those conditions he does have are being controlled.

Millette also cites "hypertension" as a risk factor. His medical records indicate a diagnosis of essential, or primary, hypertension, but also reflect that this condition is

---

[3] "Heart disease, unspecified," with an International Statistical Classification of Diseases and Related Health Problems (ICD) code of I51.9, is distinct from coronary artery disease, which has an ICD code of I25.1. *See* World Health Organization, ICD-10 Version: 2019, https://icd.who.int/browse10/2019/en#/I25.1 (coronary artery disease); https://icd.who.int/browse10/2019/en#/I51.9 (heart disease, unspecified).

controlled by medication. In any case, primary hypertension is not a risk factor identified by the CDC. The CDC includes *pulmonary* hypertension as one of the serious heart conditions that are COVID-19 risk factors. According to the CDC, pulmonary hypertension is specifically hypertension in the blood vessels to the lungs. *See* Pulmonary Hypertension, https://www.cdc.gov/heartdisease/pulmonary_hypertension.htm. Primary hypertension, on the other hand, is a common condition[4] that can be—and in Millette's case is—treated by medication. Since his high blood pressure is neither within one of the categories specified in the policy statement's application note, nor a condition identified by the CDC as increasing a person's risk for developing serious illness from COVID-19, it provides no basis for his requested relief.[5]

The same result applies to Millette's assertion of high cholesterol, or hyperlipidemia. This is not one of the medical conditions that the CDC has identified as a risk factor for contracting a more severe form of COVID-19. *See, e.g.*, *United States v. Arroyo*, No. 2:19-CR-54-1-TLS-JPK, 2020 WL 3118787, at *4 (N.D. Ind. June 12, 2020) ("High cholesterol is not listed on the CDC website as a risk factor related to COVID-19, and Defendant takes Lipitor for his high cholesterol."); *United States v. White*, No. 15-cr-20040-01, 2020 WL 2733891, at *5 (E.D. Mich. May 26, 2020) ("the CDC has not included … elevated blood cholesterol … in its list of underlying conditions that may put

---

[4] *See* High Blood Pressure, https://www.cdc.gov/bloodpressure/index.htm.

[5] *But see United States v. Salvagno*, 5:02-CR-51 (LEK), 2020 WL 3410601, at *17 (N.D.N.Y. June 22, 2020) ("Based on the well-established correlation between hypertension and severe manifestations of COVID-19, and the substantial chorus of experts who have found that there is a causal relationship, this Court did not clearly err in finding that Salvagno faced a heightened risk of severe illness and death should he contract the virus, on account of his hypertension and age.").

people at a higher risk of severe COVID-19 illness"). In addition, Millette's medical records make clear that he is taking medication to control his cholesterol levels.

Millette also claims that he is at additional risk because he has been taking prednisone to help fight a full body rash since March 2020. Def.'s Mot. at 2. It is true that the CDC has identified those with compromised immune systems as being at higher risk for severe illness from COVID-19, and that prolonged use of corticosteroids like prednisone can weaken one's immune system. *See* Groups at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#immunocompromised. However, Millette has provided nothing to support the claim that his immune system is actually compromised, or that he has been taking prednisone for long enough, and at high enough doses, to harm his immune system. In short, he has not met his burden of establishing extraordinary and compelling reasons for a sentence reduction on this basis.

Finally, Millette's history of mental illness likewise does not constitute grounds for a sentencing reduction. He notes in his motion that in 2008 or 2009, he was diagnosed with depression and prescribed Celexa, and in 2015, he was diagnosed with a mood disorder and a personality disorder after attempting suicide. Def.'s Mot. at 2. He offers nothing to establish that he *currently* suffers from a condition that is not being controlled adequately by medication, however. While, as he claims in his motion, *deterioration* of mental health, when coupled with COVID-19, may be a factor in favor of granting compassionate release, he has not shown that his condition is in fact deteriorating. To the contrary, it appears from the available records that his mental health conditions are being managed effectively.

## II. Millette Still Poses a Danger to the Safety of the Community

Even if the Court finds that Millette's medical conditions warrant further consideration under the statute, his request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community.

At the present time, it is apparent that, but for the COVID-19 pandemic, Millette would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. The only question, then, is whether the risk of COVID-19 changes that assessment, and the government submits that it does not.

Even if the Court concludes that his medical conditions do make him eligible for compassionate release, however, he is still not entitled to relief. This Court must consider all pertinent circumstances, including the § 3553(a) factors, and possible danger to the community. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

Although Millette declares that he is not a danger, his criminal history suggests otherwise. He was convicted in state court in 2010 of possessing child pornography images. This conviction evidently did not deter him, because in 2015, he was again arrested for a child pornography charge, this time in federal court. His revised Presentence Investigation Report notes that when he was interviewed at his residence during the execution of a search warrant there, he told investigators that, "viewing child pornography was a 'life-long' problem for him," and he "estimated that he had used the

internet to view child pornography for at least the last 10 years." Revised PSR ¶ 10. Although there is no evidence he has acted on his sexual interest in children by touching a child, internet child exploitation still poses a serious danger to the community, and there is little indication that he is able to control his urges to search for and possess images of child sexual abuse.

## CONCLUSION

For the above reasons, this Court should deny Millette's motion to reduce his sentence.

                                Respectfully submitted,

                                HALSEY B. FRANK
                                UNITED STATES ATTORNEY


                     By:  /s/ Craig M. Wolff
                           Craig M. Wolff
                           Assistant United States Attorney

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2020, I electronically filed this **Government's Response to Defendant's Motion for Compassionate Release** with the Clerk of Court using the CM/ECF system, which will send notification to the following:

**David Beneman
Federal Defender
david_beneman@fd.org**

HALSEY B. FRANK
UNITED STATES ATTORNEY

 /s/ Craig M. Wolff
Assistant United States Attorney
United States Attorney's Office
100 Middle Street
Portland, Maine 04101
(207) 780-3257
craig.wolff@usdoj.gov